## Commonwealth, Appellant, *v.* Lehigh Valley Railroad.

*Criminal law—Indictment against corporation—Judgment by default.*

Judgment by default may be entered against a corporation which has failed to enter an appearance when summoned by a writ of venire facias to answer an indictment for nuisance.

The history of the origin of judgment by default in civil cases considered, and such judgments extended to criminal cases in which corporations are parties defendant.

The common law of Pennsylvania discussed.

Argued April 11, 1894. Appeal, No. 463, Jan. T., 1894, by plaintiff, from order of Q. S. Luzerne Co., June T., 1893, No. 89, refusing to enter judgment against defendant in default. Before WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Rule for judgment in default of appearance in indictment against corporation for nuisance.

The facts appear by the following opinion of the court below, by RICE, P. J.:

" On May 26, 1893, the constable of Yatesville borough made return that the defendant company had obstructed a public highway by dumping dirt and stones thereon and using the same for their right of way without having reconstructed the same as they are required to do by law. An indictment was

sent before the grand jury which was returned a true bill.   A rule to show cause why a venire facias should not issue was granted, served on a director of the defendant company, and made absolute.   On October 24, 1893, a writ of venire facias issued in the following form:

" ' To the sheriff of said county, Greeting: We command you that you cause the Lehigh Valley Railroad Company to come before our court of quarter sessions of the peace to be holden at Wilkes-Barre, in and for said county, on the 15th day of November, next, there to answer the commonwealth of Pennsylvania of a certain indictment for nuisance, and have you then and there this writ.   Witness,' etc.

" The sheriff made return to the writ as follows: ' I hereby certify and return that I served this writ on the within named defendant, the Lehigh Valley Railroad Company, on the 27th day of October, 1893, by giving to W. L. Conyngham, a director of said defendant company, a true and attested copy and making known to him the contents thereof, same time giving him, the said W. L. Conyngham, a director of the said Lehigh Valley Railroad Company, defendant, a true and attested copy of the indictment.'

" The defendant company not having appeared, the district attorney, on December 6, 1893, moved for judgment by default. The question is whether the court is authorized by a statute or by the common law to enter such judgment.

" Section 41, of the act of June 13, 1836, provides: ' That every corporation aggregate or sole, shall be amenable to answer upon a writ of summons as aforesaid.' The reference by the terms ' as aforesaid ' is to preceding sections of the same act prescribing the form of summons and authorizing judgment for default of appearance, but all these provisions relate to personal actions only.

" Blackstone defines personal actions to be such ' whereby a man claims a debt, or personal duty or damages in lieu thereof, and likewise whereby a man claims a satisfaction in damages for some injury done to his person or property.' Manifestly a prosecution by indictment is not a personal action within the meaning of the act of 1836, and therefore not within its provisions authorizing judgment in default of appearance.

" But it is argued that at common law, and without any statute

on the subject, such judgment may be entered on an indictment against a corporation, and, as authority for this proposition, the case of Boston, etc., R. R. v. State, 32 N. H. 215, is cited. That case does decide that a summons is the only process to be issued to a corporation to appear and answer to an indictment, and that, upon default of appearance after service of such process, judgment may be rendered against the corporation. In this country, although it has always been held that the English colonists brought with them and made part of their laws the common law of England that was not unsuited to their new situation, yet it is also true that every state has its common law varying from the common law of England in greater or less degree, which variances have their source in the usages, habits, manners and customs of its people. What may be the common law of one state may not be of another, although the courts of both states may profess and declare that their unwritten law is based on the common law of England. These differences may result from conflict of opinion as to what the common law of England was, or because of departures therefrom, made necessary by the differing conditions, or which have grown into use by gradual adoption and have received from time to time the sanction of the courts of justice. Undoubtedly, in deciding any common law question, there being no precedent of our own, the decision of the courts of another state, which has adopted the common law of England as the basis of its jurisprudence, is entitled to very great weight; but in determining its weight it is to be considered how far the decision of the question was affected by local conditions and usages. The New Hampshire case, however correct an exposition of the common law of that state it may be, cannot be regarded as authoritative here if we look at it in the light of these general principles. (1) The learned judge who wrote the opinion of the court concedes that at common law a distringas should have issued, and no judgment could be entered until the defendant corporation had first appeared. (2) He says the distringas was never in use in New England. In case of individuals it was a regular step to outlawry, but no process of outlawry was ever used or known there. (3) We think the ground of the decision may be summed up in the following language, quoted from the opinion: 'We regard it as an his-

torical fact, that judgment by default for want of an appearance after due service of a single proper process, was an original invention in New England and has existed here since a very early date after the first settlement of the country.' Starting with the same premises, the courts of this commonwealth might possibly reach the same conclusion; although we should hesitate to say that the practice of taking judgment by default for want of appearance in a personal action could be cited as a precedent for such judgment in a criminal prosecution by indictment. But, be that as it may, in Pennsylvania the right to take judgment by default for want of appearance even in personal actions is given by statute and does not exist at common law. In Michew v. McCoy, 3 W. & S. 501, Chief Justice GIBSON said: 'It is evident from this that the common law does not permit a judgment in personam to be rendered against an absent party in any case; and every judgment for want of appearance, which is not supported by statute, is consequently irregular. . . . The practice of our courts has been modeled after that of the common pleas at Westminster, whose process is summons and distress infinite, according to the usage of the common law, and which consequently does not authorize a judgment by default for want of appearance.' In civil suits this was long since changed by statute, but there is in Pennsylvania no statute authorizing a judgment by default in any criminal case, unless a judgment in outlawry proceedings may be so called, and certainly it was not allowed at common law. We are therefore compelled to deny the motion."

*Error assigned* was above order.

*John M. Garman,* district attorney, *C. Frank Bohan* with him, for appellant.—A corporation may become amenable to the criminal law in the matter of the creation and maintenance of things which amount to or become public nuisances and be proceeded against by indictment: 1 Am. Cr. L. § 86; Del. Div. Canal Co. v. Com., 60 Pa. 371; North. Cent. Ry. v. Com., 90 Pa. 305; Pittsburg & Ry. v. Com., 101 Pa. 198; Com. v. P. R. R., 117 Pa. 643.

It is now the law to indict when the object is the imposition of a fine on the corporation estate, or the abatement of a nui-

sance: 1 Whart. Cr. L., 9th ed. § 91; Whart. Cr. Pl. & Pr. § 100.

Admitting that a corporation cannot be guilty of offence against the person, nor of perjury, nor of treason or felony; still, for that which is analogous to a mere trespass on land, an indictment may lie against it: Angell and Ames on Corporations, § 396.

A judgment against a corporation is practically a personal action and the law of this state as to judgments will properly apply: Act of June 13, 1836, § 41, P. L. 579; Chase's Bl. Com. 673.

That a venire facias is a summons and that judgment may be entered in default of appearance is decided in Railroad v. State, 32 N. H. 215; State v. Western Railroad Co., 89 N. C. 585.

In this state we can find no reference to the question except that it has been decided that when leave is granted to file an information in the nature of a quo warranto defendants must be summoned by a venire or subpoena, and if they fail to appear must be brought in by distringas : Com. v. Sprenger, 5 Bin. 353. But this was prior to the act of 1836.

*Wheaton, Darling & Woodward,* offering no oral argument, for appellee.—This action does not come within the definition of a personal action, and as evidence of this contention on our part, the statutory writ of summons prescribed by act of 1836, P. L. 572, which is therein specially made to cover the case of all personal actions, except in cases where other processes shall be especially provided, is never issued out of the quarter session, but always out of the common pleas.

The only way to compel the appearance of a corporation on an indictment is by a writ of venire facias and distress infinite : Regina v. Birmingham etc. Ry., 9 Car. & P. 469; 38 E. C. L. 278 ; Com. v. North & West Branch Ry., 5 Kulp, 293.

R. R. v. State, 32 N. H. 215, is sufficiently distinguished in the opinion of the court below.

OPINION BY MR. JUSTICE MITCHELL, Jan. 7, 1895 :

It is settled and unquestionable that corporations may be indicted at common law, and it necessarily follows that they may be brought into court by compulsion if required, for the

law is never powerless to enforce what it commands. Statutes may be imperfect, and proceedings under them for that reason may be abortive, but it is a settled rule of the common law that there is no right without a remedy.

The question before us therefore is really, what is the proper form of remedy in the case of a corporation indicted for misdemeanor, and refusing or neglecting to appear.

By the common law of England, prior to the settlement of this country, an appearance by the defendant was indispensable, both in civil and criminal cases. For want of it the proceedings came to a permanent stop. The end sought was commonly attained indirectly by process of outlawry, by which, in civil actions, after the outlaw's goods had been forfeited to the crown, satisfaction thereout was awarded to the plaintiff, but the action itself could not proceed to judgment. 3 Stephen's Com. 533 ; TILGHMAN, C. J., in Downey v. Bank, 13 S. & R. 288. In criminal cases of course the difficulty seldom arose, as the defendant was usually in arrest and his corporal appearance thus being secured the contention was deferred till the next step in the proceedings, when a contumacious prisoner stood mute and refused to plead. Even then the case was halted, and resort was had to the peine forte et dure to obtain a plea. Sir James Stephen appears to be of opinion that this practice arose from the different modes of trial in criminal cases when the ordeal was usual and the jury exceptional, only adopted on the election of the prisoner : Hist. of the Criminal Law, vol. 1, p. 298. However this may be it is unquestionable that the necessity of an appearance as well as a plea, was inexorable. And the reason of this seems to me to lie in the fundamental idea of all common law actions that they must be developed upon a defined issue. Without parties in court there could be no lis mota, and without pleas no issue and therefore no trial. The difficulty though insuperable was altogether technical. Hence appearance by attorney was the first solution and satisfied the requirements of ordinary cases, for it is to be remembered that the usual writ in the commencement of actions was the capias, and the defendant was in court in custody either of the sheriff or of his bail. The failure to appear was therefore comparatively of rare occurrence, and this rarity in large measure accounts for the tardiness of the invention or adoption of the remedy of judgment by default.

Corporations not being amenable to a capias the practice in England until altered by statute 7 & 8 Geo. 4, c. 71, sect. 5, was to compel appearance by venire facias and distringas : Regina v. Birmingham etc. R. W. Co., reported in its successive stages in 9 Car. & P. 469 ; 1 Gale & Dav. 457 ; 2 Gale & Dav. 236.

A venire facias ad respondendum is in fact a summons. " The practice . . . . was for the sheriff to whom the writ was delivered to make out a warrant or summons to his officer who thereupon summoned the defendant by delivering to him a copy . . . . and upon the sheriff's return of the names of the summoners, if the defendant did not appear; a distringas issued." 1 Tidd's Practice, 155. " As no capias lay it was the only method of proceeding against peers of the realm, corporations and hundredors on the statutes of hue and cry : " Id. 112. " The proper process on an indictment for any petty misdemeanor is a writ of venire facias which is in the nature of a summons to cause the party to appear." Tomlins's Jacob's Law Dict., tit. Process II.

We have therefore to consider the effect in Pennsylvania of a failure to appear after due service of a summons. The ordinary result is to render the party liable to a judgment by default, but the learned judge below, being of opinion that such judgment rests entirely on statute, and the act of June 13, 1836, sect. 33, P. L. 578, not applying to proceedings on indictment, refused to enter judgment in the present case.

The act of 1836 was one of the consolidated statutes reported by the commissioners appointed under the resolution of March 23, 1830, (P. L. 1829-30, p. 408,) to revise the civil code, and introduced no new practice in regard to judgments by default for want of appearance. The explanatory remarks of the commissioners on the sections concerned make no reference to any change. See Report in 2 Parke & Johnson's Digest, title Judiciary, p. 804. In fact the practice was coeval with the commonwealth, and even antedated it. In the record of the court at Upland in Pennsylvania (Memoirs of the Historical Society of Penn., vol. 7 ) are numerous instances of such judgments. At the session of March 13, 1676-7, Helm v. Oolsen, it is recorded, " the deft. remaining absent the court doe order that the s$^d$ deft. appeare att the next court day to

defend his s^d fact, or in case of further default Judgment to passe against him according to Lawe and merrit." p. 47; in Addams v. Gray, " the deft. being default and the plt. makeing the justness of his debt apeare the Court ordered judgment to bee entered against the defendant according to the plts. declaration." p. 83; in Bacon v. Billop, " the deft. being three tymes called did not appeare, and the action haveing been continued three court dayes in wch tyme notwithstanding hee had due notice and did promisse to appeare, hee hath not appeared and the plt. pressing for judgment, the Court thereupon examining the Case doe think fitt to pass judgm^t against ye deft." p. 139. These examples from the record of the earliest court administering English law on the soil of Pennsylvania, throw a strong light on the action of the colonists under Penn's charter, next to be noticed. In the sixth article of the laws agreed upon in England under the Frame of Government promulgated by Penn, it was declared that in all courts all persons of all persuasions may freely appear in their own way and personally plead their cause; that the party complained against shall be summoned no less than ten days before the trial; and before the complaint of any person shall be received he shall solemnly declare in court that he believes in his conscience his cause is just: Duke of Yorke's Book of Laws, p. 100. In the laws made at an Assembly held at Philadelphia March 10, 1683, ch. 66, the foregoing was re-enacted, with the notable addition to the sentence last quoted above, that " if the party complained against shall notwithstanding refuse to appear, the plaintiff shall have judgment against the defendant by default." Id., p. 128. I have not been able to discover, in the time and with the books at my command, how far this simple and effective mode of reaching a legal as well as just result, agreeing with the practice already in use in the territory under the government of the Duke of York's charter, as shown by the record of the Upland court, was an original invention of the colonists, or was borrowed, adapted or enlarged from some special or local practice in England. The latter would seem to be more probable, not only from the analogy of the way in which the actions of assumpsit and replevin, and other common law remedies were enlarged and adapted to new usefulness in Pennsylvania, but also from the fact that the judgment by default came

into use about the same time in other colonies, though Judge
Bell, who delivered the learned opinion in Boston etc. R. R.
v. State, 32 N. H. 215, 231, regarded it as an original invention
in New England.   But whatever its origin the practice has
continued to the present time.   The act of 1683, ch. 66, supra,
was declared one of the fundamental laws of the province,
Duke of Yorke's Laws, p. 154; was abrogated by the king and
queen in council, 1693; was put in the Petition of Right, Id.
200; and passed through the usual vicissitudes of re-enactment
and abrogation familiar to us in the contests between the early
assemblies and the royal authority.   It has been with substan-
tial identity the law of the state from the earliest day to the
present.   See the acts of 1710, Duke of Yorke's Laws, 337;
of 1715, id. 367; of 20 March 1724-5, 1 Dallas's Laws, 223, 1
Smith's Laws, 164, and Purdon's Digest of 1830, tit. Arrest,
p. 57, where this act is given as the statute in force prior to
the passage of the act of 1836.

None of these statutes apply in terms or perhaps by implica-
tion to cases of indictment.   The act of May 31, 1718, "For
the Advancement of Justice, and more certain Administration
thereof," 1 Smith's Laws, 116, provides that if any person
indicted for one of certain capital felonies named shall not
appear, a capias shall be issued, and if the party be not found
proclamation and outlawry follow in prescribed course.   The
act of Sept. 23, 1791, 3 Dallas's Laws, 115, also limits outlawry
to a few of the more serious felonies, and the existing act of
March 31, 1860, P. L. 447, is substantially a re-enactment of
the act of 1791.   For the lesser felonies, and for all misde-
meanors therefore the process of outlawry was practically abol-
ished by these statutes, and if a capias, under the general power
of the courts, was not effective, or not applicable, as was the
case in regard to corporations, there was no statutory substitute
for the ancient process of a venire facias ad respondendum, and
distringas.   But, as already seen, the whole object of the venire
and distress infinite was to secure an appearance, and the whole
necessity for an appearance was to get over the technical diffi-
culty in bringing the case to issue.   The object and the neces-
sity were the same in the civil and the criminal courts.   The
older remedies have fallen entirely into disuse in the civil courts,
and the end sought is now attained by a judgment entered for

the default.  The presence of the defendant is not required upon the trial of misdemeanors, and the necessity of an appearance is therefore as barely technical as in civil cases.  There is no difficulty in applying the same remedy, and we see no reason why the courts should not recognize the change also in criminal cases without express statute, by force of the common law of Pennsylvania.  This was the result reached by the Supreme Court of New Hampshire in Boston etc. R. R. v. The State, 32 N. H. 215, and the decision was approved and followed by the Supreme Court of North Carolina in State v. Western N. C. R. R., 89 N. C. 584.  In the former case it was said by BELL, J., " the foundation of the English common law with its infinite niceties was nothing more than usage ; and usage here holds as high a place in our esteem as usage there."  The remark is equally true of Pennsylvania.  The late Chief Justice SHARSWOOD, in a lecture before the Law Academy of Philadelphia in 1855, traced with great learning the development of a wide-reaching common law " by the silent, gradual, yet all-sufficient power of common usage and consent," citing among other instances the right of a tenant for a term certain to the way-going crop, Diffedorfer v. Jones, 1782, cited in Stultz v. Dickey, 5 Bin. 289 ; but not to spring grain, Demi v. Bossler, 1 P. & W. 224 ; the non existence of markets overt, Hosack v. Weaver, 1 Yeates, 479 ; barring dower by a simple deed, Davey v. Turner, 1 Dall. 11 ; and, as showing that changes were not confined to the civil courts, the repudiation of the punishment of the ducking stool, and some other punishments not in accordance with the notions of the people, James v. Com., 12 S. & R. 220.

" Every country " says C. J. TILGHMAN in Guardians of the Poor v. Greene, 5 Binn. 554, " has its common law.  Ours is composed partly of the common law of England, and partly of our own usages.  When our ancestors emigrated from England they took with them such of the English principles as were convenient for the situation in which they were about to place themselves.  It required time and experience to ascertain how much of the English law would be unsuitable to this country.  By degrees as circumstances demanded we adopted the English usages or substituted others better suited to our wants, until at length before the time of the revolution we had formed

a system of our own founded in general on the English constitution, but not without considerable variations."

From the earliest days of the province, as we have thus seen, the failure to appear after due service of a summons has been treated as a contempt of the process of the court, and the dilatory and cumbrous methods of outlawry and distress to avoid the technical necessity of an appearance have been discarded in favor of the shorter, simpler and more effective remedy of judgment for the default, apparently originating in usage, the fountain of common law, sanctioned by frequent statutory recognition and extended in its operation from time to time by judicial application. An instance of such judicial extension is found in the adoption of the equity rules by this court in 1865, whereby subpœnas to appear were abolished, and in their place was substituted the service of a copy of the bill, with a notice indorsed thereon, to appear, and that on failure to do so a decree pro confesso might be entered thereon, for the default. And a still more recent instance is to be found in Longwell v. Hartwell, 164 Pa. 533, where it was held that judgment might be entered by default for want of appearance against a garnishee, although the statute makes no express provision for any such judgment. We therefore conclude that the practice is entitled to recognition as an integral part of the common law of the state. It is true we have found no precedents in the quarter sessions, or in criminal cases, but as indictments against corporations were even rarer in early times than they are now, the absence of reported decisions is not conclusive against the practice, and as both the object sought and the technical objection to be avoided are the same, and as in misdemeanors, where the personal presence of the defendant is not necessary, the application of the remedy is equally convenient and effective, we see no good reason why the same remedy should not apply in one case as in the other.

The order refusing judgment is reversed, and judgment directed to be entered against the defendant by default for want of appearance.*

---

* I am under obligations in this case to a supplemental brief prepared by John Douglass Brown, Jr., Esq., of the Philadelphia Bar.—J. T. M.